Barry Douglas STEAD, Petitioner,

v.

UNITED STATES of America,
Respondent.

Nos. CIV 98–3007, CR 95–30098.

United States District Court,
D. South Dakota,
Central Division.

Sept. 03, 1999.
Order Reaffirmed Sept. 16, 1999.

Barry Douglas Stead, Lewisburg, PA, pro se.

## ORDER

KORNMANN, District Judge.

Barry Douglas Stead filed a motion under 28 U.S.C. § 2255 to vacate, set aside or correct his sentence (Doc. 70) and filed a supporting memorandum (Doc. 71). He was allowed to proceed *in forma pauperis.* Following a referral to U.S. Magistrate Judge Mark Moreno, Judge Moreno issued a "report and recommendations for disposition" (Doc. 80). This Court has conducted a *de novo* review of the entire file. This Court also heard all the evidence in the trial at which Mr. Stead was convicted and observed, of course, the performance of Mr. Stead's trial attorney. Judge Moreno declined to appoint counsel or to conduct an evidentiary hearing. Judge Moreno did give full consideration to Stead's motion for leave to file an amendment to his § 2255 motion (Doc. 73) and his amended claims.

This Court has never appointed an "intoxication expert" in any case. Testimony from a chemist has been allowed when questions were present as to dissipation rates or extrapolation based upon blood alcohol results. There would have been no basis whatever for appointing a so-called "intoxication expert" in this case, for the very reasons set forth by Judge Moreno.

Judge Moreno has very carefully analyzed the claims of Mr. Stead and appears to understand fully what happened in the course of this trial. The evidence of guilt as to all counts of the indictment in this case was overwhelming. Trial lawyers obviously do not determine the facts but must do the best they can with what facts there are. Mr. Stead's lawyer did that. Mr. Stead's past record must have driven this case to trial rather than a plea agreement. There was nothing, in this Court's view, that Mr. Stead's lawyer could have done other than what he did do, given the fact that no plea agreement was reached. Stead is, without question, not entitled to relief under 28 U.S.C. § 2255 and his motion, as amended, (Docs. 70 and 73) should be denied.

No objections have been filed. The report and recommendation for disposition should be adopted in its entirety. Now, therefore,

IT IS ORDERED that the motion to vacate, set aside or correct the sentence of Mr. Stead as a person in federal custody (Docs. 70 and 73) is hereby denied, and the Report and Recommendations for Disposition (Doc. 80) is hereby adopted.

Dated this 2nd day of September, 1999.

Barry Douglas Stead filed a motion under 28 U.S.C. § 2255 to vacate, set aside or correct his sentence (Doc 70) and filed a supporting memorandum (Doc 71). He was allowed to proceed *in forma pauperis*. Following a referral to U.S. Magistrate Judge Mark Moreno, Judge Moreno issued a "report and recommendations for disposition" (Doc 80). This Court previously conducted a *de novo* review of the entire file. This Court also heard all the evidence in the trial at which Mr. Stead was convinced and observed, of course, the performance of Mr. Stead's trial attorney. Judge Moreno declined to appoint counsel or to conduct an evidentiary hearing. Judge Moreno did give full consideration to Stead's motion for leave to file an amendment to his § 2255 motion (Doc. 73) and his amended claims.

By virtue of an Order dated September 2, 1999, this Court denied the motion of Mr. Stead and adopted the Report and Recommendations, stating also that no objections were filed. The Court subsequently received objections from Mr. Stead (Doc. 82) and such objections have now been carefully considered. They will be considered as timely filed. Mr. Stead, for the most part, repeats arguments rejected by the jury. Mr. Stead's version of what happened was rejected by the jury as the fact finder, the jury having obviously concluded that other eye witnesses were more credible as to what happened. The Court continues to reject the claim that counsel for Mr. Stead was deficient or provided ineffective assistance. The Court sees nothing to change the earlier ruling and the report and recommendation for disposition should be adopted in its entirety and the objections should be overruled.

Now, therefore,

IT IS ORDERED that the objections of Mr. Stead (Doc. 82) are overruled and the Court reaffirms the earlier action to deny the motion to vacate, set aside or correct the sentence of Mr. Stead as a person in federal custody (Docs. 70 and 73), and the court reaffirms that, despite the objections, the Report and Recommendations (sic) for Disposition (Doc. 80) is hereby adopted.

## REPORT AND RECOMMENDATIONS FOR DISPOSITION

MORENO, United States Magistrate Judge.

### *INTRODUCTION*

The above-captioned 28 U.S.C. § 2255 matter was referred to this Court by the

District Court[1] pursuant to 28 U.S.C. 636(b)(1)(B) for the purpose of determining defendant, Barry Douglas Stead's (hereinafter Stead) eligibility to proceed in forma pauperis, conducting any necessary hearings, including evidentiary hearings, and submitting to it proposed findings of fact and recommendations for disposition of the matter. Docket No. 72.

After careful review of the record and based on the totality of the circumstances present, this Court does now make and propose the following findings of fact, report and recommendations for disposition.

### PROCEDURAL HISTORY

Stead was charged by a superseding indictment with committing the offenses of second degree murder (Count I), assaulting, resisting or impeding a federal officer with a deadly weapon (Count II), using or carrying a firearm during and in relation to a crime of violence (Count III) and being a felon in possession of a firearm (Count IV) in violation of 18 U.S.C. §§ 1153, 1111, 111(a), 924(c)(1) and 922(g)(1). On April 3, 1996, a jury found Stead guilty of all four of the charged offenses. Docket No. 41. The trial court thereafter sentenced Stead to terms of imprisonment and supervised release totaling 35 years and 4 years respectively. Docket No. 51. The Eighth Circuit Court of Appeals affirmed the trial court's judgment in an opinion filed on March 6, 1997, Docket No. 61, and reported as *United States v. Stead,* 107 F.3d 876 (8th Cir.1997) (unpublished opinion). The Eighth Circuit's mandate was later issued on April 3, 1997. Docket No. 62. Stead did not seek certiorari review of his convictions with the United States Supreme Court.

Subsequently, Stead filed a motion under § 2255 to vacate, set aside or correct his sentence and included with the motion a supporting memorandum. Docket Nos. 70, 71. Following the District Court's order of reference, Docket No. 72, Stead moved for leave to amend his motion, Docket No. 73. Later, this Court granted Stead's tardy application to proceed *in forma pauperis.* Docket No. 79.

In his § 2255 motion and proposed amendment thereto, Stead claims that his trial counsel was ineffective in five different respects. Docket Nos. 70, 71, 73. The government denies that Stead is entitled to any relief under § 2255 and argues that both the motion and the proposed amendment to it should be dismissed because the same were not timely filed. Docket No. 78.

### FACTS

Stead's convictions revolve around the shooting of Harry Dubray, Sr. on December 1, 1995 in Parmelee, South Dakota, located on the Rosebud Indian Reservation. Docket No. 57.

On the afternoon of December 1st, Dubray and his sons, Harry, Jr., and Marvin, were at Stead's residence. T.Tr. 108. Some time that afternoon, Stead's brother, James Stead, showed up at the residence. T.Tr. 284, 298, 301, 349. Most of the individuals there were, or had been, drinking alcoholic beverages. T.Tr. 85–86, 116–285, 299, 311–12. At some point in time, Dubray and Marvin left the residence and went back to their house, approximately two doors down the street. T.Tr. 58–59, 104, 283, 348.

A short time later, Harry, Jr., and Stead got in an argument which escalated into a fist fight outside Stead's house. T.Tr. 229, 301–03, 350–53. Harry, Jr. was badly beaten up in the fight and began walking back to Dubray's residence. T.Tr. 53, 110, 153, 174, 243, 284–86, 353, 375. He was met part of the way by Dubray, who noticed that Harry, Jr. was bleeding from his mouth and face. T.Tr. 284–86. Dubray escorted Harry, Jr. into the house and laid him down on a couch. T.Tr. 53, 110.

Dubray then came out of the house and was met by Jesse and Peter Knife, (ages 21 and 16, respectively, T.Tr. 136–38, 163), who had stopped over to visit Harry, Jr.

1. The Honorable Charles B. Kornmann, United States District Judge, presiding.

T.Tr. 140–41, 243–44. Dubray immediately informed the Knifes that Harry, Jr. had been "ganged" (i.e., beaten up) and pointed toward the Stead residence. T.Tr. 141, 166–67. Not having seen Harry, Jr. or knowing for sure where he was (Dubray was not clear in his description of Harry, Jr.'s location at the time) and being concerned about him, the Knifes took off running toward the Stead residence. T.Tr. 142–43.

In the meantime, Stead and James were getting into a vehicle outside of the residence. T.Tr. 143–45, 231, 304, 334, 377. The Knifes approached the vehicle to see if Harry, Jr. was there and confronted Stead and James about beating up Harry, Jr. T.Tr. 143–45, 168–69, 304, 306, 335. As Stead, James, and the Knifes were arguing with each other, Dubray arrived. T.Tr. 147. Upset over what he perceived the Steads had done to his son, Dubray tackled James and the two began wrestling on the ground in the back yard of the residence. T.Tr. 147–48, 172. Upon seeing this, Stead grabbed a loaded rifle, and while Dubray and James were wrestling with each other, approached them with the rifle and shot Dubray in the back at close range. T.Tr. 148, 172–73, 246, 358–60, 383–86. Before discharging the rifle, Stead yelled for James to move. T.Tr. 321–25.

Shortly after the shot was fired, everyone present scattered. T.Tr. 388. Dubray managed to get up and walk back to his residence, where he found a couch and passed out. T.Tr. 54, 110.

Subsequently, the tribal police were summoned and Officer Luther Nakapaahu responded. T.Tr. 47–48. Nakapaahu eventually went to Stead's residence and was confronted with a loaded rifle pointed at him by Stead. T.Tr. 59, 61, 64, 95, 99–100, 391, 398. Nakaapahu drew his gun and a standoff ensued, with he and Stead both pointing their loaded weapons at each other. T.Tr. 61–62. Eventually, after being told three times to drop his weapon, Stead put down the loaded rifle. T.Tr. 61–63, 80, 98, 398. Officer Tony Long arrived

moments later to assist Nakaapahu and while doing so recalled hearing Stead say that he shot Dubray because Dubray "tried to fuck with him." T.Tr. 263.

Stead, who had two prior felony convictions from the State of California in 1989 and 1992, T.Tr. 29–35, 43, 401, had the rifle in his possession for a week or two before the incident with Dubray, and had kept it loaded in his residence, T.Tr. 251, 366. In addition, Stead had fired the rifle prior to shooting Dubray. T.Tr. 366.

On December 28, 1995, approximately four weeks after the shooting, Dubray died. T.Tr. 111, 133. An autopsy was performed and the bullet from Stead's rifle was removed from Dubray's back. T.Tr. 203–06. A gunshot wound was determined to be the cause of death. T.Tr. 133–34, 206.

Stead maintained at trial that he was justified in using deadly force to protect himself and/or James from the threatened harm of Dubray and others. T.Tr. 357–61; *see also*, Docket Nos. 33 (proposed self defense/defense of another instruction), 40 (instruction 14). He also claimed that he was drunk (and therefore unable to form the specific intent to commit the offense of second degree murder), that he believed he was subject to a hostile attack, that he did not know at first that Nakapaahu was a police officer and that he was entitled to use reasonable force in his own defense. T.Tr. 361–66, 372; *see also*, Docket Nos. 33 (proposed intoxication instruction) and 40 (instructions 13, 20).

## DISCUSSION

### I

### TIMELINESS OF STEAD'S MOTION AND AMENDMENTS THERETO

In its written response, the government asserts that Stead's § 2255 motion and proposed amendment are time-barred and must be dismissed. Docket No. 78 at 2–4. The government argues that the motion and the amendment proposed to it are untimely under the one-year limitation

found in § 2255. The one-year provision went into effect on April 24, 1996 with the enactment of the Anti–Terrorism And Effective Death Penalty Act of 1996 (AEDPA), Pub.L. No. 104–132, Title I, § 105, 110 Stat. 1220 and reads in pertinent part as follows:

> A 1–year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—
>
> > (1) the date on which the judgment of conviction becomes final;
> >
> > (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;
> >
> > (3) the date on which the right asserted was initially recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or
> >
> > (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

Prior to the 1996 amendment to § 2255, no statutory period of limitation was imposed for filing habeas motions in federal court pursuant to § 2255.[2]

The one-year limitation period imposed by § 2255 begins to run on the latest of several possible dates. For Stead, the relevant triggering date is that which is described in § 2255(1) as "the date on which the judgment of conviction becomes final." 2255 though does not specify *when* a "judgment of conviction becomes final."

The circuits have taken two general approaches to determining the finality of a *judgment of conviction*. The Third and Tenth circuits have held that a judgment of conviction becomes final when the United States Supreme Court denies certiorari or the time expires for seeking certiorari. *Kapral v. United States*, 166 F.3d 565, 570–77 (3d Cir.1999); *United States v. Lacey*, No. 98–3030, 1998 WL 777067 at —— 1–2 (10th Cir. Oct. 27, 1998). In *Kapral*, the Third Circuit opined that "if defendant does not file a certiorari petition, the judgment of conviction does not become 'final' until the time for seeking certiorari review expires." 166 F.3d at 570. Likewise, in *Lacey*, the Tenth Circuit, relying on the Supreme Court's construction of finality in the context of retroactivity, *see Griffith v. Kentucky*, 479 U.S. 314, 321 n. 6, 107 S.Ct. 708, 93 L.Ed.2d 649 (1987), reasoned that a conviction becomes final when certiorari is denied or the time to apply for certiorari has expired. 1998 WL 777067 at *1; *see also, Rhine v. Boone*, 182 F.3d 1153, 1154 (10th Cir.1999).

Taking a different approach, the Seventh Circuit concluded "that federal prisoners who decide not to seek certiorari with the Supreme Court will have the period of limitations begin to run on the date this court issues the mandate in their direct criminal appeal." *Gendron v. United States*, 154 F.3d 672, 674 (7th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1758, 143 L.Ed.2d 790 (1999). In the Seventh Circuit's view, the Supreme Court's definition of "final" in the retroactivity context does not determine when a conviction becomes "final" under the AEDPA. *Id.* at 673–74. The Seventh Circuit observed that 28 U.S.C. § 2244(d), which established the one-year limitations period for 28 U.S.C. § 2254 petitions, expressly provides that the limitations period does not begin to run until the completion of the state appellate process including a petition for discretionary review to the state's highest court. *Id.* at 675. According to the Seventh Circuit, the absence of such language in § 2255 reflects congressional intent to treat the two statutes differently. *Id.* On this basis, the Court held that a § 2255

---

2. That is not to say, however, that a § 2255 motion was not entirely without limitation. Such motions were subject to traditional equitable doctrines, such as laches, as well as Rule 9(a) of the Rules Governing § 2255 Proceedings; *see also,* Advisory Committee Note to Rule 9(a).

motion filed by a defendant who never petitioned for certiorari review with the Supreme Court, was untimely and properly dismissed because the same had been filed more than one year following issuance of the direct appeal mandate. *Id.*

The Eighth Circuit has not addressed the finality issue in the context of § 2255. It has, however, cited with approval the *Kapral* decision in a recent 2255 case, *see Moore v. United States,* 173 F.3d 1131, 1134 (8th Cir.1999), and ruled that where a § 2254 petitioner has failed to file a petition for a writ of certiorari to the Supreme Court, the date on which the judgment of conviction becomes "final" is determined by "the conclusion of all direct criminal appeals in the state system followed by the expiration of the time allotted for filing a petition for the writ [of certiorari]", *Nichols v. Bowersox,* 172 F.3d 1068, 1072 (8th Cir.1999) (*en banc*) (*quoting Smith v. Bowersox,* 159 F.3d 345, 348 (8th Cir.1998), *cert. denied,* —— U.S. ——, 119 S.Ct. 1133, 143 L.Ed.2d 126 (1999)). The Eighth Circuit, thus, has made it clear that a state court judgment becomes "final", for purposes of 2244(d)(1)(A), upon the expiration of the petitioner's time to file a certiorari petition. *Id.*

■ This Court has read the text of §§ 2244(d)(1) and 2255, reviewed the legislative history of these two provisions and considered applicable case law interpreting the same. The Court is persuaded that a judgment of conviction becomes "final", within the meaning of § 2255, on *the later of* (1) the date on which the Supreme Court affirms the conviction and sentence on the merits or denies a defendant's petition for Certiorari, or (2) the date on which the defendant's time for filing a petition for certiorari expires. In doing so, the Court adopts the well-reasoned analysis of the Third Circuit in *Kapral,* including the concurring opinion thereto. The Court believes that if the issue were squarely presented to the Eighth Circuit, it would, in all likelihood, follow the lead of the Third and Tenth Circuits and hold that a federal prisoner, who chooses not to seek certiorari review, has fifteen months from the date of the appellate mandate within which to file a § 2255 motion.

■ In the instant case, Stead's pro se motion and proposed amendment were filed *well before* the fifteen-month time period, following the Eighth Circuit's mandate, and therefore were timely.[3] Based on the prison mailbox rule, which plainly applies to *pro se* pleadings in § 2255 cases, *see Moore,* 173 F.3d at 1135, this Court's construction of Eighth Circuit precedent, cases from other circuits and treatises which have addressed the "finality" subject matter, *see id.; Nichols,* 172 F.3d at 1072–77; *Kapral,* 166 F.3d at 567–81; *Lacey,* 1998 WL 777067 at *1–2; 1 J. Liebman & R. Hertz, *Federal Habeas Corpus Practice & Procedure,* § 5.1b at 228–33 & nn. 57–62 (3d ed.1998), the Court concludes that Stead's motion and proposed amended motion *are not* time-barred by § 2255's one-year limitation period.

## II

## AMENDMENT TO MOTION

Stead seeks leave to augment his initial pro se motion with two new claims premised on the ineffectiveness of his trial counsel. Docket No. 73.

■ Rule 12 of the Rules Governing § 2255 Proceedings specifically authorizes a reviewing court to apply the Federal Rules of Civil Procedure to motions filed pursuant to § 2255. Federal Rule of Civil Procedure 15(a) gives § 2255 defendants, like other civil complainants, the right to amend their motion once without leave of court "at any time before [the government

---

3. The record reflects that the Eighth Circuit issued its mandate on April 3, 1997, Docket No. 62, Stead sent his motion to the clerk, via certified mail, on March 9, 1998, Docket No. 69, the motion was received and filed by the Clerk on March 16, 1998, Docket No. 70, Stead placed his proposed amendment to the motion in the prison mail depository on May 4, 1998, Docket No. 73, and the same was filed seven days later. *Id.*

files] a responsive pleading." Rule 15(a) makes clear that "leave [to amend] shall be freely given when justice so requires."

In the instant case, there is no evidence that Stead's proposed amendment is made in bad faith, for dilatory purposes or with the intention of delaying the proceedings. Moreover, it does not appear that the government would be unduly prejudiced by permitting Stead to raise two additional ineffective assistance of counsel claims. Furthermore, the interests of justice would be served by allowing Stead leave to amend because he would not be able to raise his new ineffectiveness claims in another § 2255 motion.

While it is true that Stead's amendment does not "relate back" to the date he "filed" his original motion, *see United States v. Craycraft*, 167 F.3d 451, 456–57 (8th Cir.1999); *see also, Moore*, 173 F.3d at 1135, the amendment nonetheless is not time barred because it was filed, under the prison mailbox rule, within the 15–month window period prescribed in situations like this one. Accordingly, Stead's motion for leave to amend is granted.

## III

### APPOINTMENT OF COUNSEL

Stead has requested that he be appointed counsel under 18 U.S.C. § 3006A(g).[4] Docket No. 71 at 11. This Court has considered Stead's request in light of the relevant factors articulated by the Eighth Circuit for appointment of counsel in like cases, *see McCall v. Benson*, 114 F.3d 754, 756 (8th Cir.1997); *Nachtigall v. Class*, 48 F.3d 1076, 1081–82 (8th Cir.1995); *Hoggard v. Purkett*, 29 F.3d 469, 471 (8th Cir.1994); *Abdullah v. Norris*, 18 F.3d 571, 573 (8th Cir.1994), *cert. denied*, 513 U.S. 857, 115 S.Ct. 163, 130 L.Ed.2d 101 (1994), and believes that the "interests of justice" do *not* require the appointment in this instance. Stead raises no issues that involve conflicting testimony

or that mandate fact investigation; his ineffective assistance of counsel claims do not require complex legal reasoning or analysis; and he presents his facts and legal arguments clearly and understandably. *See McCall*, 114 F.3d at 756; *Nachtigall*, 48 F.3d at 1082. Stead's request for appointment of counsel, therefore, is denied.

## IV

### EVIDENTIARY HEARING

In the prayer for relief portion of his § 2255 motion and in the "conclusion" sections of his memorandum and amendment to the motion, Stead asks that this Court grant him an evidentiary hearing. Docket Nos. 70 at 7, 71 at 11, 73 at 9. An evidentiary hearing, however, need not be held (1) if the defendant's allegations, accepted as true, would not entitle him to relief; or (2) the allegations cannot be accepted as true because they are contradicted by the record, are inherently incredible or conclusions rather than statements of fact. *Delgado v. United States*, 162 F.3d 981, 983 (8th Cir.1998) (*quoting Engelen v. United States*, 68 F.3d 238, 240 (8th Cir.1995)). Likewise, an evidentiary hearing is not required "where the files and records of the case conclusively show that a [defendant] is not entitled to relief." *Standing Bear v. United States*, 68 F.3d 271, 272 (8th Cir.1995), *cert. denied*, 517 U.S. 1147, 116 S.Ct. 1444, 134 L.Ed.2d 564 (1996); *United States v. Schmitz*, 887 F.2d 843, 844 (8th Cir.1989) (citations omitted), *see also, Holloway v. United States*, 960 F.2d 1348, 1351 (8th Cir.1992).

Stead's ineffective assistance of counsel claims are ones that are capable of resolution from the record. *See Rogers v. United States*, 1 F.3d 697, 699 (8th Cir. 1993); *see also, United States v. Raddatz*, 447 U.S. 667, 675, 100 S.Ct. 2406, 65 L.Ed.2d 424 (1980); *Dall v. United States*,

---

**4.** Rule 8(c) of the Rules Governing § 2255 Proceedings and 18 U.S.C. § 3006A(a)(2)(B) collectively authorize a reviewing court to appoint counsel for a defendant at any stage of the proceeding if "the interests of justice so require."

957 F.2d 571, 572 (8th Cir.1992). After close scrutiny of the record, this Court is convinced that Stead is not entitled to relief. *See Cheek v. United States,* 858 F.2d 1330, 1333 (8th Cir.1988). As such, his request for an evidentiary hearing is denied.[5]

## V

## INEFFECTIVE ASSISTANCE OF COUNSEL

### A. Standard and Applicable Law.

The Constitution provides that "in all criminal prosecutions, the accused shall enjoy the right ... to have the Assistance of Counsel for his defence". U.S. Const. Amend. VI. To establish that trial counsel's assistance was ineffective, a defendant:

> must show that counsel's performance was deficient. This requires that counsel made errors so serious that counsel was not functioning as "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defendant. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result was reliable.

*Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984); *see also, Smith v. United States,* 182 F.3d 1023, 1025 (8th Cir.1999); *Shaw v. United States,* 892 F.Supp. 1265, 1270 (D.S.D. 1995), *aff'd.,* 92 F.3d 1189 (8th Cir.1996). A defendant must make a showing of *both* deficient performance and prejudice in order to obtain § 2255 relief based on ineffective assistance. *Strickland,* 466 U.S. at 687, 690–94, 104 S.Ct. 2052; *see also, En-*

*gelen,* 68 F.3d at 240. If a defendant fails to prove unreasonable performance, then the prejudice prong of the *Strickland* test need not be considered, and vice versa. *United States v. Flynn,* 87 F.3d 996, 1000 (8th Cir.1996).

In reviewing counsel's performance, there is a strong presumption that counsel's conduct fell within "the wide range of professionally competent assistance." *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052; *Fretwell v. Norris,* 133 F.3d 621, 623, 625–27 (8th Cir.), *cert. denied,* —— U.S. ——, 119 S.Ct. 115, 142 L.Ed.2d 92 (1998). When reviewing the propriety of counsel's performance under the *Strickland* test, the proper "inquiry is not whether counsel's decision was correct or wise, but rather whether it 'was an unreasonable one which only an incompetent attorney would adopt' considering all of the circumstances." *Flynn,* 87 F.3d at 1000 (*quoting Stokes v. Armontrout,* 851 F.2d 1085, 1092 (8th Cir. 1988), *cert. denied,* 488 U.S. 1019, 109 S.Ct. 823, 102 L.Ed.2d 812 (1989)).

Professionally unreasonable errors, however, do not satisfy the burden of proving ineffectiveness absent a showing of prejudice to the defendant. *Strickland,* 466 U.S. at 691–92, 104 S.Ct. 2052. A court will not set aside a judgment of conviction unless counsel's performance renders the result of a proceeding unreliable or fundamentally unfair. *Lockhart v. Fretwell,* 506 U.S. 364, 374, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993). In other words, " 'counsel's unprofessional errors [must] so upset the adversarial balance between the defense and the prosecution that the trial was rendered unfair and the verdict suspect.' " *Id.* at 369, 113 S.Ct. 838, (*quoting*

---

**5.** It appears that the Rules Governing § 2255 Proceedings provide for an evidentiary hearing when the standards enunciated in *Townsend v. Sain,* 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) require, or at least permit, one in the discretion of the assigned judicial officer. Although the AEDPA modified, to some extent, the *Townsend* standard for obtaining evidentiary hearings in 28 U.S.C. § 2254 cases, Congress made no parallel

changes in § 2255 practice and evidently chose to leave intact the *Townsend* standard and to create a discrepancy between the right to a hearing in § 2254 and § 2255 cases. *See* 2 Liebman & Hertz, § 41.6d at 1599–1600 & nn. 12–15.

> In the case at hand, an evidentiary hearing is neither mandated nor warranted under *Townsend.*

*Nix v. Whiteside,* 475 U.S. 157, 175, 106 S.Ct. 988, 89 L.Ed.2d 123 (1986)). Unreliability or unfairness, however, does not result unless the ineffectiveness of counsel deprives the defendant of a substantive or procedural right to which the law entitles him. *Lockhart,* 506 U.S. at 372, 113 S.Ct. 838.

## B. Intoxication Defense

Stead initially contends that his trial counsel's representation was constitutionally ineffective because counsel failed to pursue an intoxication defense at trial and present expert testimony in support thereof. Docket No. 70 at 5, 71 at 2–6. He argues that his counsel's half-hearted investigation and presentation of this defense were "very costly". Docket No. 71 at 6.

■ Trial counsel zealously tried to convince the jury and the trial court that Stead acted in self defense or in defense of another. Docket No. 44–45; T.Tr. 97–101, 357–61; *see also,* Jury Select. Tr. 32–34. Counsel elicited testimony from witnesses in support of this defense theory and secured a jury instruction regarding the same. Docket No. 40 (instruction 14); T.Tr. 73–81, 231–40, 252–54, 304–11, 334–37, 353–66. Counsel also proposed an intoxication instruction based on testimony that Stead was drunk at the time of the shooting. Docket Nos. 33 (proposed intoxication instruction), 40 (instruction 13); T.Tr. 67, 92–93, 244, 372.

Stead, however, made it difficult to advocate an intoxication defense with any vigor when he testified that he "knew what he was doing" at the time he shot Dubray. T.Tr. 372. When questioned by the prosecutor on cross examination about his level of intoxication on the evening in question, Stead testified as follows:

Q. Did you really think that was going to be a fair fight with Mr. Dubray being that drunk?

A. I was drunk, too.

Q. Were you as drunk as him?

A. I wasn't staggering. But I was drunk to where there's some things that I don't recall.

Q. Okay. And were you pretty well under the influence of alcohol?

A. Yes.

Q. And can I assume that when you're under the influence of alcohol you don't always remember things the way you do when you're sober?

A. Yeah.

Q. Okay. And you were drunk that day, weren't you?

A. Yes, I was, but I knew—I knew what I was doing.

T.Tr. 372. Given Stead's own testimony, which served to undercut any intoxication defense, trial counsel's strategic decision to rely as fully as possible on a self defense/defense of another theory was well within the range of professional reasonable judgment. According counsel the deference to which he is entitled, this Court is unable to say that counsel's performance was in any way inadequate. *Strickland,* 466 U.S. at 689–91, 699, 104 S.Ct. 2052.

■ Nor can it be said that trial counsel was dilatory in not presenting expert testimony concerning the effects of intoxication. Curiously, Stead states in his supporting memorandum that he and James "were very well intoxicated" at the time of the shooting incident. Docket No. 71 at 4. Why Stead would want the jury to be presented with expert testimony regarding James's level of intoxication is a mystery. Clearly, James was a key witness for Stead and presumably someone Stead wanted the jury to believe was *not* intoxicated and had a clear recollection of what happened.

■ Furthermore, it appears unlikely that the trial court would have appointed an expert to testify generally on the issue of intoxication if timely application had been made for one. Plainly, there is no absolute right to the appointment of an expert witness and, even if such a wit-

ness is appointed, the admission of testimony from the witness is within the sound discretion of the trial court. *See* 18 U.S.C. § 3006A(e); *United States v. Gipp*, 147 F.3d 680, 688 (8th Cir.1998). Where an expert witness would not have assisted the jury in evaluating an issue under consideration before it, a court may properly refuse to appoint an expert under § 3006A(e). *See United States v. Blade*, 811 F.2d 461, 464–65 (8th Cir.), *cert. denied*, 484 U.S. 839, 108 S.Ct. 124, 98 L.Ed.2d 82 (1987).

Initially, Stead fails to cite any authority to support his contention that he was entitled to an intoxication expert in this instance. This Court believes that it is questionable:

1. Whether the appointment of an expert on intoxication was "necessary" within the meaning of § 3006A(e);

2. Whether expert testimony regarding the general issue of intoxication was admissible under Fed.R.Evid. 702, 403 or otherwise; and

3. Whether such testimony would have even benefitted Stead.

Indeed, there was no alcohol testing done on Stead or James and the testimony pertaining to the time period and amount of alcohol they consumed on the day of the shooting was equivocal. T.Tr. 67, 92–93, 244, 372. Any expert testimony as to Stead and James's level of intoxication, therefore, would have been speculative and subject to attack. Moreover, any opinions offered by the expert may very well have contradicted or served to undercut Stead's claim that he acted in self defense or in defense of another.

Furthermore, any alleged neglect, on the part of trial counsel, in securing an expert to bolster Stead's intoxication defense was justified as legitimate trial strategy. Counsel chose to push for an acquittal based on the theory that Stead acted in self defense or in defense of another (a complete defense to the second degree murder charge and the lesser included voluntary and involuntary manslaughter offenses) while at the same time preserving the intoxication defense (a defense to the murder charge but not to the voluntary and involuntary manslaughter offenses) in the event the jury did not accept the self defense/defense of another theory. This tactical decision was not only reasonable, it was prudent and well thought out. By submitting both defenses in the manner he did, counsel gave the jury two alternative ways to acquit Stead of the murder charge. Although the jury ultimately chose to convict Stead of murdering Dubray, counsel's efforts at trying to avoid this result were by no means deficient or inadequate. *Strickland*, 466 U.S. at 687–91, 699, 104 S.Ct. 2052.

■ Yet, even assuming, somehow, that counsel was lackadaisical in his pursuant of an intoxication defense, nonetheless, Stead can hardly prove that he was prejudiced given his own testimony at trial that despite being drunk, he "knew what [he] was doing" when he shot Dubray. *Id.* at 693–96, 699–700, 104 S.Ct. 2052. His testimony, while perhaps beneficial to his self defense/defense of another claim, torpedoed his intoxication defense and with it any assertion that he was too drunk to form the specific intent required to commit the crime of second degree murder. For this, Stead has no one to blame but himself.

## C. "Heat of Passion" Instruction.

■ Stead next asserts that he was denied effective representation by virtue of his trial counsel's "failure to request and move for the proper jury instruction as it relates to voluntary manslaughter." Docket No. 71 at 1; *see also*, Docket No. 70 at 5. He maintains that counsel was ineffective because counsel did not propose an instruction that defined "heat of passion". Docket No. 71 at 7–8.

At the outset, it is important to note that Stead was convicted of *second degree murder*, as charged in Count I of the superseding indictment, and not of voluntary manslaughter (one of the two lesser included offenses). Docket No. 41. The trial court

specifically instructed the jurors that if, but only if, they were unable to reach a verdict on the murder charge, then they were to go on and proceed to decide whether Stead committed the lesser included crimes of voluntary and involuntary manslaughter. Docket No. 40 (instruction 16). The jury, therefore, probably never even considered the voluntary manslaughter instruction because it already found Stead guilty of the murder offense charged in Count I of the superseding indictment.[6]

▮▮▮▮▮ Second, as a general rule, "improper jury instructions are not cognizable in a § 2255 proceeding," *Monteer v. Benson,* 574 F.2d 447, 449 (8th Cir.1978), because such a proceeding is not a substitute for a direct appeal, *Catches v. United States,* 582 F.2d 453, 458 n. 11 (8th Cir. 1978) (*citing Jackson v. United States,* 495 F.2d 349, 351 (8th Cir.1974)). Collateral relief, however may be granted when an erroneous jury instruction constitutes "a fundamental defect" that results "in a complete miscarriage of justice, [or] an omission inconsistent with rudimentary demands of a fair trial." *Louisell v. Director of Iowa Department of Corrections,* 178 F.3d 1019, 1022 (8th Cir.1999) (*quoting Hill v. United States,* 368 U.S. 424, 428, 82 S.Ct. 468, 7 L.Ed.2d 417 (1962)); *see also, Kaufman v. United States,* 394 U.S. 217, 227 n. 8, 89 S.Ct. 1068, 22 L.Ed.2d 227 (1969); *Merrill v. United States,* 599 F.2d 240, 242 (8th Cir.1979). Inasmuch as the instruction being assailed is one that the jury did not or had no need to examine and inasmuch as the jury instructions, including the one on voluntary manslaughter, when read together, properly informed the jury of the law applicable to the case, Stead cannot establish that a constitutional

violation has occurred so as to entitle him to § 2255 relief.

Third, there is no credible evidence that Stead acted in the "heat of passion" when he shot and killed Dubray. In fact, the Eighth Circuit, on direct appeal, concluded that the record contained "strong evidence" to support Stead's second degree murder conviction. Docket No. 61.

Finally, Stead's citation to and reliance on *United States v. Paul,* 37 F.3d 496 (9th Cir.1994), is misplaced. Using *Paul,* Stead contends that trial counsel should have proposed an instruction that included a "heat of passion" definition. Unlike the jury instructions discussed in *Paul,* the instructions given here correctly stated the law governing the case and the mental state requirement for the voluntary manslaughter offense.[7] *United States v. Bordeaux,* 980 F.2d 534, 537–38 (8th Cir.1992); *United States v. Elk,* 658 F.2d 644, 648–49 (8th Cir.1981); *DeMarrias v. United States,* 453 F.2d 211, 214–15 (8th Cir.1972); *see also, United States v. Browner,* 889 F.2d 549, 552 (5th Cir.1989).

Under these circumstances, trial counsel's failure to propose a voluntary manslaughter instruction defining what "heat of passion" is did not amount to deficient performance or serve to prejudice Stead to such an extent that the fairness of his trial was fatally tainted. Stead has failed to satisfy both prongs of the *Strickland* test and therefore cannot prevail on his ineffectiveness assertion. *Strickland,* 466 U.S. at 700, 104 S.Ct. 2052.

**D. Prior Convictions.**

Stead claims that his trial counsel's failure to object to the admission of testimony

6. Assuming the jury followed the trial court's instructions, which there is no reason to doubt, there would be no reason for the jury to have read the voluntary manslaughter instruction or, more importantly, to have attempted to decide whether Stead killed Dubray in the "heat of passion."

7. The trial court's lesser included involuntary manslaughter instruction, in contrast to the

instruction that was given in *Paul,* likewise properly described the necessary mental state required for a conviction. *See United States v. Lincoln,* 630 F.2d 1313, 1319–20 (8th Cir. 1980); *United States v. Schmidt,* 626 F.2d 616, 617–18 (8th Cir.), *cert. denied,* 449 U.S. 904, 101 S.Ct. 278, 66 L.Ed.2d 136 (1980); *see also, Browner,* 889 F.2d at 552–55.

and exhibits concerning his prior convictions constituted inadequate assistance. Docket No. 70 at 5, 71 at 8–10. He argues that counsel should have objected to what he refers to as "this prejudicial evidence" because the same improperly impeached his character. Docket No. 71 at 9–10.

▆▆▆▆ Count IV of the superseding indictment charged Stead with being a convicted felon in possession of a firearm in violation of 18 U.S.C. § 922(g)(1). To convict Stead of the offense as charged, the government was required to prove, in its case in chief, that Stead had been convicted in 1989 and 1992 of felonies in California state court.[8] Because these prior felonies were *elements* of the firearm possession offense and because Stead had previously pled not guilty to the offense, trial counsel had no legitimate basis for objecting to the introduction of such evidence and would have looked foolish in doing so. The trial court did instruct the jury as to how it could use the prior convictions and specifically admonished the jury that it could not use such evidence as proof that Stead committed any of the other offenses charged in the superseding indictment.

▆▆▆▆ Moreover, Stead admitted on direct and cross examination at trial that he had two prior felony convictions in California. T.Tr. 347, 401. Having himself offered, for the jury's consideration, the very evidence he contends his trial counsel should have sought to exclude, Stead cannot now be heard to complain—either about what his counsel failed to do or how he was prejudiced by it.

Given this record, trial counsel's conduct was entirely reasonable under the circumstances. Additionally, any prejudice that may have resulted from counsel's inactions was in part Stead's own doing and was cured by the trial court's limiting instruction. Stead's ineffectiveness claim thus is

wholly without merit. *Strickland,* 466 U.S. at 687–700, 104 S.Ct. 2052.

### E. Peremptory Challenge.

Stead contends that his trial counsel provided him with incompetent assistance when counsel failed to utilize a peremptory challenge of a "prejudicial juror". Docket No. 73 at 3. He maintains that counsel should have struck juror no. 31, Steven Gerald Jones, because Jones "not only knew the victim and his family, he also was acquainted with several key witnesses involved in [the] case." Docket No. 73 at 4.

Early in the jury selection process, the trial court asked if any of the panel members knew or had heard anything about the facts of the case. Jury Select. Tr. 10. Jones responded in the affirmative to the court's question and the court and Jones thereafter engaged in a brief dialogue:

JURY PANEL MEMBER JONES: I've heard about it. I didn't know that Mr. Dubray was dead. But I knew Mr. Dubray personally.

THE COURT: Do you know his son, as well?

JURY PANEL MEMBER JONES: Yes, sir.

THE COURT: Is there anything about that relationship that would cause you to wonder whether you could be a fair and impartial juror, here?

JURY PANEL MEMBER JONES: No, sir.

THE COURT: In other words, if either [trial counsel] or [the prosecutor] knew what's in your mind, neither of them would have any worry about you giving both sides a fair trial?

JURY PANEL MEMBER JONES: No, sir.

THE COURT: Alright, thank you.

---

8. Although Stead does not argue that the government was limited to proving his felon status on the firearm possession charge to one prior conviction, if he did, his argument would have been foreclosed by Eighth Circuit

case law. *See United States v. Garner,* 32 F.3d 1305, 1311 (8th Cir.1994) ("It is not error to allow the government to introduce more than one conviction in a case where a single conviction is necessary to make the case").

Jury Select. Tr. 10–11. Later, trial counsel went back to Jones and questioned him about his knowledge of the Dubray family:

[COUNSEL]: Now, I'll wrap up here in just a minute.

I think, Mr. Jones, . . . you stated that you knew the Dubray family. That would be Harry Dubray, Sr. who is the deceased person?

JURY PANEL MEMBER JONES: Yes.

[COUNSEL]: He has a son, Harry Dubray, Jr., I think Dubarray is his nickname.

JURY PANEL MEMBER JONES: I know him as Harris.

[COUNSEL]: What is your relationship with that family?

JURY PANEL MEMBER JONES: I work at the Rosebud Dormitory and Mr. Dubray was an employee there for awhile.

[COUNSEL]: When was that?

JURY PANEL MEMBER JONES: This is back in 19—well, I started in '81. I think he was employed there in '79. And we've had openings there at the dormitory for his employment and he was applying for some of the jobs and he would come and ask me about them and something like that.

[COUNSEL]: And that was Harry Dubray, Sr.?

JURY PANEL MEMBER JONES: Yes.

[COUNSEL]: Anybody else in the Dubray family that you know other than Harry Dubray, Sr., and his son?

JURY PANEL MEMBER JONES: I'm not sure if Eldon Dubray is his brother or not. Eldon Dubray is his brother over there.

[COUNSEL]: I assume you heard something about this case?

JURY PANEL MEMBER JONES: Yes, through the newspapers. Like I told the Judge, I didn't know Mr. Dubray had expired.

[COUNSEL]: Do you believe that you could be a juror in this case without any—going in the case without any prejudged ideas at all?

JURY PANEL MEMBER JONES: Yes.

Jury Select. Tr. 40–41. Thereafter, counsel inquired whether any of the panel members were acquainted with other individuals who might be called as witnesses during the trial:

[COUNSEL]: Other witnesses may be called, and I don't know just exactly who will be called, but I'm only concerned here if anybody is a very close friend or relative of any of these particular witnesses, or had any involvement in anything whatsoever.

But James Stead, who'll be a brother to Barry Stead. Antoinette Siers, who is the girl friend of Barry Stead. Rhonda Black Lance. I believe that is James Stead's—Yes, sir, Mr. Jones?

JURY PANEL MEMBER JONES: Rhonda Black Lance?

[COUNSEL]: Rhonda, I believe her name is. Lady in her late 20's.

JURY PANEL MEMBER JONES: As I said, I work in the dormitories and she was one of our students there for awhile.

[COUNSEL]: And Eric Black Lance will probably be called.

And Harry Dubray, Jr., we've talked about him. Jason Shot Through Arrows might be a witness.

JURY PANEL MEMBER JONES: I know all three of them.

[COUNSEL]: Okay. Marvin Dubray, I believe about an eleven-year-old boy could possibly called.

Do you know him, Mr. Jones?

JURY PANEL MEMBER JONES: No, sir.

[COUNSEL]: Officer Nakaapahu, I believe I'm saying that name right. He's a police officer there at Rosebud.

John Miller, another police officer, criminal investigator. Anybody know him?

JURY PANEL MEMBER JONES: Yes, sir.

Jury Select. Tr. 41–43. Subsequently, counsel objected to the prosecutor's peremptory strikes of two Indian panel members (No. 26, Duane Grey Cloud, Sr., and No. 63, Kathy L. Spotted Bear) but counsel's objections were overruled by the court. Jury Select Tr. 45–47. Following a sidebar conference, the jury was seated and included Jones, an Indian. Jury Select. Tr. 47.

▆ Preliminarily, Stead's contention that Jones was acquainted with "several key witnesses" in the case is not fairly supported by the record. Although Jones did state that he knew Eric Black Lance and John Miller, neither of these individuals testified at trial. Docket Nos. 42, 57. Furthermore, and contrary to Stead's assertion, Jones did not say during jury selection that he knew Nakaapahu. Jury Select. Tr. 42–43. In fact, aside from Dubray (the deceased victim), the only other individuals Jones knew who testified, were Harry, Jr. and Rhonda Black Lance. Jury Select. Tr. 11, 40–41.[9] Jones's connection with Dubray was a remote one—he apparently worked with Dubray back in 1979 or 1981, Jury Select. Tr. 40—and he did not even know that Dubray had died. Jury Select. Tr. 41. As for Jones's familiarity with the two trial witnesses, one of the witnesses (Black Lance) testified for the defense and the other witness (Harry, Jr.) was called by the prosecution. T.Tr. 282, 332. Significantly, Jones made it clear to the trial court that even though he knew both Dubray and Harry, Jr., he could be a fair and impartial juror and there was no reason for either the prosecutor or counsel to worry about him giving both sides a fair trial. Jury Select. Tr. 11; see also id. at 41 (where, in response to a question by counsel, Jones indicated he had no "prejudged ideas" about the case).

It is important to note that Stead is Indian and that Jones was the last Indian still on the jury panel. Jury Select. Tr. 34, 45–47. Initially, there were three Indians on the jury panel and two of them were stricken by the government and the trial court was satisfied with the prosecutor's "race-neutral" explanations. Jury Select. Tr. 2–3, 45–47. Jones was the remaining Indian on the panel and trial counsel opted to allow him to sit as a juror. Docket No. 35; Jury Select. 47–48. Counsel no doubt recognized the benefit of having an Indian on the jury panel who did not appear to have any hostility toward Stead or any of his witnesses and who indicated that he could be fair and impartial. In doing so, counsel made a tactical decision based on what he saw and heard from the panel members and what he believed to be in Stead's best interest. This Court believes that his strategic decision to allow Jones to sit as a juror, when viewed from counsel's perspective at the time, cannot now be second-guessed using the "distorting effects of hindsight". *Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Because Stead has failed to sustain his burden of proving that counsel's performance was deficient, the Court need not determine whether he was prejudiced by counsel's alleged nonfeasance. *Strickland,* 466 U.S. at 697, 700, 104 S.Ct. 2052; *Stokes,* 851 F.2d at 1092.

### F. Double Jeopardy and Ex Post Facto Claims.

Finally, Stead claims that his right to effective assistance was violated because his trial counsel did not object or move to strike Count III of the superseding indictment on the ground that the same violated the Double Jeopardy and Ex Post Facto Clauses of the Constitution. Docket No. 73 at 6. Stead argues that his sentence for the commission of a felony with a firearm, consecutive to his second degree murder sentence, placed him in jeopardy twice for the same offense and infringed upon ex

---

**9.** Although Jones did indicate that he knew Harry, Jr., he denied knowing Marvin Dubray, Harry, Jr.'s juvenile brother. Jury Select. Tr. 42.

post facto protections. Docket No. 73 at 6–9.

### 1. *Double Jeopardy Clause.*

 The Fifth Amendment's Double Jeopardy Clause protects a defendant against, among other things, multiple punishments for the same offense, *United States v. Dixon,* 509 U.S. 688, 695–96, 113 S.Ct. 2849, 125 L.Ed.2d 556 (1993); *North Carolina v. Pearce,* 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969), *overruled in part on other grounds, Alabama v. Smith,* 490 U.S. 794, 109 S.Ct. 2201, 104 L.Ed.2d 865 (1989)—unless there is a "clear indication of contrary legislative intent," *Whalen v. United States,* 445 U.S. 684, 692, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980). The Supreme Court has held that:

> [w]ith respect to cumulative sentences imposed in a single trial, the Double Jeopardy Clause does no more than prevent the sentencing court from prescribing greater punishment than the legislature intended.

*Missouri v. Hunter,* 459 U.S. 359, 366, 103 S.Ct. 673, 74 L.Ed.2d 535 (1983). Thus, the government is not prohibited, by the Double Jeopardy Clause, from proving violations of two criminal statutes with the same course of conduct if Congress clearly intended to subject defendants to "double punishment." *Hunter,* 459 U.S. at 367, 103 S.Ct. 673; *Simpson v. United States,* 435 U.S. 6, 11–12, 98 S.Ct. 909, 55 L.Ed.2d 70 (1978); *United States v. Jones,* 34 F.3d 596, 601 (8th Cir.1994), *cert. denied,* 514 U.S. 1067, 115 S.Ct. 1701, 131 L.Ed.2d 563 (1995).

 At the time Stead was charged and sentenced, 18 U.S.C. § 924(c), stated in pertinent part as follows:

> Whoever, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime which provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime ... be sentenced to imprisonment for five years. . . .

The Eighth Circuit has held that imposition of the five-year mandatory sentence under § 924(c), in addition to the sentence for the underlying crime of violence, does not constitutes double jeopardy. *United States v. Simpson,* 979 F.2d 1282, 1285–86 (8th Cir.1992), *cert. denied,* 507 U.S. 943, 113 S.Ct. 1345, 122 L.Ed.2d 727 (1993). The Court read the statute to unambiguously provide "that one convicted as a principal of using a firearm to commit a violent crime may be punished both for the underlying crime and for the § 924(c) charge." 979 F.2d at 1285. In *United States v. Mills,* 835 F.2d 1262 (8th Cir. 1987) (per curiam), the Court found that the legislative history evinced a clear intent on the part of Congress to amend § 924(c) for the express purpose of authorizing an additional sentence to that imposed for the underlying felony. 835 F.2d at 1264. Moreover, in *Jones,* the Court noted "that, although before 1984, § 924(c) 'did not explicitly provide that its enhancement penalties applied even if the offender was prosecuted under another statute carrying enhanced penalties for the same conduct,' in 1984 Congress 'amended § 924(c) to make that intention perfectly clear.'" 34 F.3d at 601 (*quoting Simpson,* 979 F.2d at 1285–86 n. 2.)

The language of § 924(c) clearly shows that Congress intended to impose multiple punishments for the use or carrying of a firearm during and in relation to "any" violent crime. Second degree murder is, without question, a crime of violence. *See* 18 U.S.C. § 924(c)(3)(A) & (B). The language of the statute demonstrates a manifest desire, on the part of Congress, to impose § 924(c)'s five-year mandatory prison term cumulatively with the punishment for a predicate violent crime such as murder. *Jones,* 34 F.3d at 602; *see also, Simpson,* 979 F.2d at 1285–86.

The legislative history of § 924(c) also supports this conclusion. That history is

discussed in detail by the Fifth Circuit in *United States v. Singleton*, 16 F.3d 1419, 1425–27 (5th Cir.1994) and will not be repeated here.

A review of the decisions from other circuits addressing the double jeopardy issue reveals that courts have almost uniformly rejected Stead's constitutional claim and upheld consecutive sentences for crimes of violence and § 924(c). *See, e.g., United States v. Collins*, 109 F.3d 1413, 1420 (9th Cir.) (mailing a destructive device with the intent to kill or injure), *cert. denied,* —— U.S. ——, 118 S.Ct. 183, 139 L.Ed.2d 123 (1997); *United States v. Moore*, 43 F.3d 568, 570–73 (11th Cir.) (carjacking), *cert. denied,* 516 U.S. 879, 116 S.Ct. 212, 133 L.Ed.2d 144 (1995); *United States v. Johnson*, 32 F.3d 82, 83–86 (4th Cir.) (same), *cert. denied,* 513 U.S. 1050, 115 S.Ct. 650, 130 L.Ed.2d 554 (1994); *United States v. Martinez*, 28 F.3d 444, 445–46 (5th Cir.) (obstructing commerce by robbery), *cert. denied,* 513 U.S. 910, 115 S.Ct. 281, 130 L.Ed.2d 197 (1994); *United States v. Mohammed*, 27 F.3d 815, 818–20 (2d Cir.) (carjacking), *cert. denied,* 513 U.S. 975, 115 S.Ct. 451, 130 L.Ed.2d 360 (1994); *United States v. Weston*, 960 F.2d 212, 220 (1st Cir.1992) (threatening bodily injury with intent to retaliate); *United States v. Lanzi*, 933 F.2d 824, 826 (10th Cir.1991) (armed bank robbery); *United States v. Moore*, 917 F.2d 215, 228–30 (6th Cir.1990) (armed robbery), *cert. denied,* 499 U.S. 963, 111 S.Ct. 1590, 113 L.Ed.2d 654 (1991). This Court agrees with the reasoning and conclusion of these cases.

Because trial counsel would not have prevailed in striking down or obtaining a dismissal of Count III of the superseding indictment on double jeopardy grounds, counsel cannot be faulted or, more importantly, held to have acted inappropriately. *Strickland*, 466 U.S. at 687, 104 S.Ct. 2052.

### 2. *Ex Post Facto Clause.*

The same holds true with respect to trial counsel attacking the § 924(c) charge under the Ex Post Facto Clause, U.S. Const., Art. I, § 9, cl. 3.

The ex post facto prohibition forbids Congress and the states from enacting any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." *Weaver v. Graham*, 450 U.S. 24, 28, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981) (footnote and internal quotations omitted); *see also, Collins v. Youngblood*, 497 U.S. 37, 43, 110 S.Ct. 2715, 111 L.Ed.2d 30 (1990) ("legislatures may not retroactively alter the definition of crimes or increase the punishment for criminal acts"). "To fall within the [ ] prohibition, a law must be retrospective—that is, 'it must apply to events occurring before its enactment'— and it 'must disadvantage the offender affected by it' by altering the definition of criminal conduct or increasing the punishment for the crime." *Lynce v. Mathis*, 519 U.S. 433, 441, 117 S.Ct. 891, 137 L.Ed.2d 63 (1997) (*quoting Weaver,* 450 U.S. at 29, 101 S.Ct. 960).

Section 924(c), on its face, does not violate the Ex Post Facto Clause insofar as it imposes punishment upon a person who, after September 13, 1994, used or carried a firearm during and in relation to a crime of violence. The government here alleged, and the jury found beyond a reasonable doubt, that on or about December 1, 1995, Stead had knowingly and intentionally used and carried a firearm during and in relation to a violent crime, an act which occurred subsequent to the effective date of the charged offense. The Firearms Act, including the 1986–1994 amendments thereto, gave Stead fair warning of § 924(c)'s effect and yet he chose to violate it anyway. Because the punishment Stead received was in accordance with the law as it existed at the time he committed the § 924(c) offense, his prosecution did not transgress ex post facto strictures. *See e.g., United States v. Allen*, 886 F.2d 143, 146 (8th Cir.1989) ("so long as the actual crime for which a defendant is being sentenced occurred after the effective date of the new statute, there is no ex post facto

violation."); *see also, United States v. Russell,* No. 99–1451, 186 F.3d 883, 884–86 (8th Cir.1999); *United States v. Williams,* 128 F.3d 1239, 1241–42 (8th Cir.1997); *United States v. Crawford,* 115 F.3d 1397, 1402–03 (8th Cir.), *cert. denied,* 522 U.S. 934, 118 S.Ct. 341, 139 L.Ed.2d 264 (1997).

As such, trial counsel's failure to file what would have amounted to a futile motion and/or objection to Count III of the superseding indictment, premised on a violation of the Ex Post Facto Clause, was neither "deficient" nor an omission that in any way prejudiced Stead. *Strickland,* 466 U.S. at 687–701, 104 S.Ct. 2052.

### CONCLUSION AND RECOMMENDATIONS

Upon due consideration of the record and in light of applicable precedent, this Court believes that Stead is not entitled to relief under 28 U.S.C. § 2255 and that his motion, including the amendment thereto, should be dismissed. Accordingly, based on the foregoing findings of fact and legal discussion and pursuant to 28 U.S.C. § 636(b)(1)(B) and (C), it is hereby

RECOMMENDED that the government's request to dismiss Stead's § 2255 motion and proposed amendment to the motion as untimely, Docket No. 78 at 2–4, 11, be DENIED. It is further

RECOMMENDED that Stead's motion for leave to file an amendment to his § 2255 motion, Docket No. 73, be GRANTED. It is further

RECOMMENDED that Stead's requests for appointment of counsel, Docket No. 71 at 11, and for an evidentiary hearing, Docket Nos. 70 at 7, 71 at 11, 73 at 9, be DENIED. It is further

RECOMMENDED that Stead's § 2255 motion, as amended, Docket Nos. 70, 73, be DENIED in all respects and DISMISSED with prejudice.